UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

EDUARDA DOREGO,                          )
                                         )
                    Plaintiff,           )     CIVIL ACTION NO.
                                         )     10-11768-DPW
v.                                       )
                                         )
MICHAEL J. ASTRUE, Commissioner          )
Social Security Administration           )
                                         )
                    Defendant.           )


MEMORANDUM AND ORDER
February 24, 2012

Eduarda Dorego appeals the final decision of the
Commissioner of Social Security (the "Commissioner") denying her
claim for Social Security Disability Insurance ("SSDI") and
Supplemental Security Income ("SSI").  After consideration of the
record before me, which I find provides substantial evidence for
the denial, I will affirm the Commissioner's decision.

**I.   BACKGROUND**

**A.   *Medical History***

Dorego was born on May 18, 1968.  She has a long history of
both physical and mental impairments.  While she claimed a
disability onset date of January 1, 2001 in her SSI and SSDI
applications, her counsel amended the onset date to July 1, 2006,

at the subsequent hearing before the Administrative Law Judge (ALJ).[1]

1. <u>Medical Records</u>

i. Physical Impairments

On January 7, 2004, Dorego's primary care provider, Dr. Americo Almeida, noted that she had a "[l]ongstanding history of low back pain" that was "worse recently." An MRI performed in February, 2004, revealed that she suffered from degenerative disc disease ("DDD"). A straight leg raising test was positive bilaterally; the patient experienced pain at about forty degrees on the right leg and seventy degrees on the left, and the pain was localized in the lower back radiating to the right leg.

In March, 2005, Dorego told her doctors that she had been in a car accident and was experiencing increasing sharp and persistent pain in the lower back. Gil Teixera, D.O., found muscle tenderness but no motor or sensory deficits and diagnosed Dorego with lower back pain secondary to a myofascial strain. He prescribed Flexeril and referred the claimant to a chiropractor. Two weeks later, Dorego reported at a follow-up visit that the treatment had provided some relief from her back pain.

In April and May, 2006, Dorego continued to complain of pain in the lower back and additionally complained of pains in her

---

[1] The ALJ misidentified the alleged onset date as January 1, 2001, in her findings of fact and conclusions of law.

shoulder.  An MRI of the shoulder performed in May, 2006, did not show a rupture of the rotator cuff, and Dr. Almeida diagnosed tenosynovitis.  An MRI of the back performed at the same time showed that the claimant had protrusions at L4-5 and L5-S1.  In June, 2006, Dr. Almeida prescribed Dorego one Percocet per day for her back pain.  In July and August, 2006, Dr. Almeida noted at follow-up visits that Dorego had DDD with pain in the back. She was referred to physiotherapy for six months.

In August, 2006, Leslie Stern, M.D., examined Dorego and found that she had a normal gait, significant bilateral paraspinal muscle spasm, sixty degrees of forward flexion, normal power in the lower extremities, and some generalized diminution of pinprick in the right lower leg in the L5 and S1 distributions on sensory examination.  A straight leg raising test was thirty degrees bilaterally.  A review of the MRI scan revealed "very mild" DDD at both L4-5 and L5-S1.  Dr. Stern concluded that Dorego's back pain was likely due to her DDD and that because there was no canal or neuroforaminal compromise, surgery would not be helpful.  He recommended therapy to demonstrate stretching exercises "to address the significant paraspinal muscle spasm which has been a consequence of her [DDD], despite the fact that the latter is relatively mild."

Dorego continued to complain of back pain at appointments with her treating physician in September and November of 2006.

In November, she was evaluated by a physical therapist and a plan of care was created.  There is no evidence that she continued treatment beyond the initial evaluation.

In January, 2007, Joseph Doerr, M.D. conducted a physiatric examination of the claimant.  He found that she had a slight neurologic deficit in the lateral calf; some restriction of her right hip, lumbar flexion to forty degrees and left side bending to ten degrees, secondary to pain; some diffuse tenderness of her right lumbar paraspinal tissues; and some referred pain distal laterally.  A straight leg raise test was negative and she had a symmetric gait and reflexes.  Dr. Doerr opined that the pain was "probably more focal myofascial" and suggested physical therapy.

In June, 2007, Richard Fox, M.D. examined Dorego's left thumb, which she reported she had injured when she fell on ice the previous January.  He diagnosed a complete disruption of the ulnar collateral ligament of her left thumb and noted that she also had grade 1/4 CMC arthritis of the thumb.  Later that month, Dorego underwent a reconstruction of the ligament.  The surgical wound became infected and tested positive for MRSA, but the infection cleared over the course of weeks.  At a follow up appointment, in September, 2007, Dr. Fox found that Dorego had "improved stability of the collateral ligament and very good motion at the MP joint," and noted that she had "no major

complaints in a functional capacity."  The record indicates no further treatment for Dorego's left thumb.

In September, 2007, Aleksander Feoktisov, M.D., a rheumotologist, evaluated the claimant.  He found that she had straight leg raising to eighty degrees bilaterally; that she could contact the floor with lumbar flexion but had some pain with extension; and that she had tenderness with palpation at the L5-S1 level, with muscle spasm and pain with contralateral lateral bending.  Dr. Feoktistov noted that Dorego's "[l]eft first metacarpophalangeal joint is unstable and the patient cannot tolerate resisted flexion of the interphalangeal joint."  He diagnosed the claimant with fibromyalgia secondary to sleep problems.

ii.  Mental Impairments

Dorego has a history of depression and anxiety.  Her medical records indicate that she was prescribed Klonopin at least as early as January 2001, 289, with an increase in her prescription in July, 2001, 290.  Dr. Almeida re-started the prescription in January, 2002, noting "[a]nxiety with depression."  He noted her depression and anxiety in March, 2002, and referred her to Dr. Sousa, a psychiatrist, and Maria Ferreira, a licensed social worker.  Dr. Almeida noted her depression and anxiety again in July, 2002.  In November, 2002, he wrote that Dorego "suffers from severe anxiety and depression.  She can't sleep, no

interest, lacks concentration. She is always crying. She is no longer working, can't hold down a job due to lack of concentration." He noted that she had been referred to Dr. Sousa and Maria Ferreira but had never kept the appointments.

In January, 2003, Dr. Almeida noted that Dorego had severe anxiety and depression, but that she appeared much better than the last time he had seen her, was taking Klonopin when needed instead of every day, and was in a new relationship and planned to marry. However, in May, 2003, she reported that her husband had left her after only two and a half months, and Dr. Almeida noted that she was "very depressed, very anxious." She reported that she had a new job, was working long hours, and could not get an appointment to see Dr. Sousa again because she only had Mondays off. Dr. Almeida wrote that he would "refer her back to Dr. Sousa as she does need psych intervention."

Dr. Sousa's records indicate that he first examined the claimant in 1998, and that he saw her three times in 2003, three times in 2006, four times in 2007, and at least three times in 2008.[2] In June, 2006, he filled out a medical source statement in which he diagnosed Dorego with generalized anxiety disorder, dysthymia, and recurrent major depressive disorder in partial

---

[2] The ALJ stated that Dr. Sousa saw the claimant once in 2007 and did not mention the 2008 visits at all. The ALJ does not appear to have taken into account the additional records from Dr. Sousa that the claimant filed in May, 2008.

remission.  He assigned her a current Global Assessment of
Functioning ("GAF") score of 55, which is consistent with a
moderate impairment in social and occupational functioning.

In September, 2006, Charles Howland, Ph.D., conducted a
psychological examination of the claimant.  He found:

> Her affect is constricted and her mood is depressed and
> anxious.  She admits to frequent crying spells, thoughts of
> worthlessness and feelings of loneliness.  She denies
> psychotic symptoms or suicidal ideation . . . . Her judgment
> is very impulsive and immature . . . . Her reasoning is very
> concrete . . . . Her recent memory is only fair . . . . Her
> cognitive functioning is estimated to be within the
> borderline range.

Dr. Howland stated that "[h]er current symptoms include daily
depress[ion] and anxious mood, insomnia, frequent crying spells,
poor concentration and thoughts of worthlessness," and noted that
"[s]ocially, she is quite isolated."  He diagnosed Dorego with
major depression, recurrent and moderate; dependent personality
disorder; and an estimated borderline intellectual functioning.
He assigned a current GAF score of 48, which is consistent with
serious impairment in social and occupational functioning.

Dorego began a course of counseling with Maria Ferreira,
MSW, LICSW, in the spring of 2007.  In April, 2007, in her intake
assessment, Ferreira diagnosed Dorego with anxiety and
depression.  She assigned her a current GAF score of 55, which is
consistent with a moderate impairment of social and occupational
functioning.  Ferreira saw the claimant again in May, 2007, but
did not see her afterward until December of that year.  In

January, 2008, Ferreira diagnosed Dorego with bipolar disorder and post traumatic stress disorder and once again assigned her a current GAF score of 55. The claimant had five further sessions with Ferreira in 2008 and seven sessions in 2009.[3]

iii. Medications

Through her attorney, the claimant submitted a list of medications updated as of April, 2008, indicating that she has been taking Klonopin (psychiatric) since 1993, Percocet (analgesic) since 2006, Prozac (psychiatric) since 2007, and Trazadone (sleep / psychiatric) since 2007.

2.   Medical Opinions

There are a number of comprehensive medical opinions in the record. Some opinions were submitted by treatment providers and some were submitted by agency consultants. Some address Dorego's physical impairments and some address her mental health.

i.   Physical Impairments

In June, 2006, Dr. Almeida completed a Medical Source Assessment (Physical) Questionnaire. He found that Dorego could sit, stand or walk for no more than two hours at a time, and for no more than a total of six hours total during an eight hour day. He found that she could only occasionally lift up to ten pounds, could never grasp with her left hand, could only occasionally

---

[3] The records of Dorego's appointments with Ferreira in 2009 were submitted by Dorego's attorney after the issuance of the ALJ's decision.

push and pull with her hands and arms, could never operate foot controls with either foot, could only occasionally perform fine manipulation with her right hand, and could only occasionally be exposed to unprotected heights, driving automotive equipment, or pulmonary irritants. He found that the claimant's level of pain was severe and it would preclude sustained concentration and productivity.

In July, 2006, an agency consultant, Carlos Carpena, M.D., completed a Physical Residual Functional Capacity Assessment based on his review of Dorego's file. He concluded that she could occasionally lift twenty pounds, frequently lift ten pounds, stand or walk with normal breaks for a total of approximately six hours in an eight hour work day, sit with normal breaks for a total of about six hours in an eight hour workday, and push or pull, including operation of hand or foot controls, for an unlimited amount of time. He further concluded that she could only occasionally climb, balance, stoop, kneel, crouch, or crawl.

In January, 2007, state agency consultant R. McGan completed a Physical Residual Functional Capacity Assessment based on his review of Dorego's file. Dr. McGan concluded that Dorego could occasionally lift twenty pounds, frequently lift ten pounds, stand or walk about six hours in an eight hour workday, sit with normal breaks about six hours in an eight hour workday, and push

or pull (including operation of hand or foot controls) unlimitedly. Dr. McGan concluded that she could only occasionally could stoop, kneel, crouch or crawl, and that she should avoid concentrated exposure to hazards such as machinery or heights.

In April, 2008, Dr. Almeida completed a Physical Capacities Evaluation form. He found that Dorego could sit, stand or walk for no more than thirty minutes at a time, and that she could sit for a total of half an hour, stand for a total of two hours, and walk for a total of two hours in an eight hour day. He found that she could lift and/or carry no more than five pounds occasionally, could not grasp or operate hand controls with her left hand, and could not perform fine manipulation bilaterally. He found that Dorego could never crawl, and could only occasionally bend, squat, climb and reach. He found that she was mildly restricted from moving machinery, marked changes in temperature and humidity, driving automotive equipment, and exposure to dust, fumes and gases.

ii. Mental Impairments

In October, 2006, Sumner Stone, M.D., a state agency consultant, completed a Psychiatric Review Technique form. He diagnosed Dorego with major depression, partial remission, superimposed on dysthymia, and with generalized persistent anxiety. He found that she had mild restrictions on her

activities of daily living; mild difficulties in maintaining social functioning; and mild difficulties in maintaining concentration, persistence, and pace.

Also in October, 2006, Dr. Stone completed a Mental Residual Functional Capacity Assessment. He diagnosed Dorego with affective disorder and anxiety disorder. He found that she was moderately limited in her abilities to understand and remember detailed instructions, to carry out detailed instructions, to maintain attention and concentration for extended periods, to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, and to respond appropriately to changes in the work setting.

In January, 2007, Jane Marks, M.D., a state agency consultant, completed a Psychiatric Review Technique form. She diagnosed Dorego with depression in partial remission and with generalized anxiety disorder. She found that Dorego had mild restrictions on her activities of daily living; mild difficulties in maintaining social functioning; and moderate difficulties in maintaining concentration, persistence, or pace.

Dr. Marks also completed a Mental Residual Functional Capacity Assessment. She diagnosed Dorego with depression and anxiety. She found that Dorego was moderately limited in her abilities to understand and remember detailed instructions, to

carry out detailed instructions, to maintain attention and concentration for extended periods, to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, and to respond appropriately to changes in the work setting.  Dr. Marks found that Dorego could understand and remember simple, one to three step instructions, that she could sustain concentration for two hour intervals over an eight hour workday while performing simple tasks, that she is capable of relating appropriately, and that she can adapt to simple changes and stressors in the workplace.

In April, 2008, Ferreira completed a Psychiatric Review Form.  She found that Dorego met the criteria for listings 12.04, 12.06 and 12.08 of 20 CFR Part 404, Subpart P, Appendix 1 (affective disorders, anxiety-related disorders, and personality disorders).  Ferreira diagnosed the claimant with depressive syndrome, bipolar syndrome, post traumatic stress disorder, anxiety-related disorder, and personality disorder.  She found that Dorego had a marked restriction on her activities in daily living; marked difficulties in maintaining social functioning; a constant deficiency of concentration, persistence, or pace resulting in the failure to complete tasks in a timely manner; and continual episodes of decompensation.

Also in April, 2008, Dr. Sousa completed a Psychiatric Review Technique form. Like Ferreira, he found that the claimant met the criteria for listings 12.04, 12.06 and 12.08 of 20 CFR Part 404, Subpart P, Appendix 1 (affective disorders, anxiety related disorders, and personality disorders). He diagnosed the claimant with depressive syndrome, manic syndrome, bipolar syndrome, anxiety-related disorder, and personality disorder. He found that the claimant had a moderate restriction on her activities of daily living; marked difficulties in maintaining social functioning; a frequent deficiency of concentration, persistence, or pace resulting in the failure to complete tasks in a timely manner; and repeated episodes of decompensation.

**B.** *Procedural History*

On June 8, 2006, Dorego filed an application for SSDI and SSI alleging disability beginning January 1, 2001. The claims were denied on October 5, 2006, and again on reconsideration on January 30, 2007. On November 4, 2008, after two administrative hearings, ALJ Martha Bower issued a decision finding Dorego not disabled. On June 12, 2010, the Appeals Council denied Dorego's request for review.

1.  Application and Appeals

In her application and during the appeals process, Dorego discussed her medical conditions, her treatment, and her daily activities.

13

She stated that she handles her personal care, sometimes with help from her daughter; that she can heat food in the microwave or make sandwiches; that she goes grocery shopping with her daughters; and that she does light dusting when she can but her daughters do the cleaning.  She stated that she listens to music and the radio daily but does not watch television or read, that she speaks with others on the phone, and that she goes to church occasionally.

Her earnings records indicate that she performed some work and earned $4906 in 2001, $585 in 2002, $5218 in 2003, $2151 in 2004, $1235 in 2005, and nothing in 2006 or 2007.

### 2.   Hearing Testimony

The ALJ held hearings on May 5, and October 23, 2008.  The claimant testified through an interpreter at both hearings.  Dr. Stephen Kaplan, an impartial medical expert, testified at the first hearing.  At the second hearing, Kenneth R. Smith, an impartial vocational expert, and Paul Durand, a friend of the claimant, both testified.

### i.   Eduarda Dorego

The claimant testified that she has back pain every day, all day long.  She testified that on a scale of zero to ten, where ten is childbirth, her back pain is at a seven.  She stated that she takes two Percocet a day, and the pain decreases a little bit, but it helps only for an hour or two.  She stated that her

left thumb is numb and hurts a lot, and that she can make a fist but she no longer has strength in her left hand. Additionally, she testified that she is always dizzy.

Dorego testified that she can prepare simple meals by heating food in the microwave, but is unable to cook; that at times she has problems performing light household chores; that her daughter does the grocery shopping except that she can shop for light items; that she can drive although she stopped two weeks before the hearing; that she uses the computer for ten to fifteen minutes at a time to play games; and that she cannot watch television or read for more than fifteen minutes. She stated that she can sit for about fifteen minutes and cannot lift anything heavier than the weight of about two bags of bread.

Dorego further testified that she was treated for depression by her primary care provider for years, that she sees Dr. Souza, and that in 2007 she started seeing Maria Ferreira. She testified that she is depressed, she has feelings of worthlessness, she has no friends, and she likes to stay home because she can cry. She stated that she had difficulty concentrating and is forgetful. She stated that she has difficulty sleeping due to nerves and pain. She stated that the medication sometimes makes her hear voices.

ii.   Paul Durand

Paul Durand, a friend of Dorego's, testified that he has known her for approximately seven years and sees her two or three times a week.  He stated that his wife additionally speaks to Dorego on the phone.  He stated that he and his wife help Dorego by getting medications for her, giving her rides to the grocery store, keeping track of and reminding her of appointments, and trying to get her out of the house.  He stated that Dorego can cook simple meals such as hot dogs and hamburgers, and that her house and her person are kept clean.

iii. Dr. Steven Kaplan

Dr. Kaplan reviewed Dorego's medical records and testified that there were two consistent complaints: first, depression and anxiety, and second, back pain.

He stated that the physical examination in March, 2005; the neurological examination by Leslie Stern; the orthopedic examination in November, 2006; and Dr. Feoktisov's examination in September, 2007, all indicate muscular back pain and muscle spasms of the lower back.  He observed that Dr. Feoktisov's notation regarding fibromyalgia only meant that the claimant was having sleep problems, which cause aches and pains reminiscent of chronic pain problems.  He stated that the psychiatric records can be summarized as treatment for depression and anxiety.  He stated that Dr. Feoktisov's examination indicated that Dorego

"still has some problems with the left . . . joint in the thumb" causing her "some limitation, for example, in repetitive use or strong grasping with the left hand from that thumb."

Dr. Kaplan testified that the limitations described by "the non-examining DDS physician" were reasonable. He stated that while he agreed with these limitations, he additionally believed that she had problems grasping with her left hand; the DDS physician had analyzed the record before the hand injury had come to light. He explained that "in summary, this is a lady with primary problems of some ongoing muscle spasm of the low back, as well as a documented problem with stability at the base of the left thumb, along with an ongoing problem with anxiety and depression."

iv.  Kenneth R. Smith

Kenneth R. Smith, a vocational rehabilitation counselor, testified that the claimant could not perform her past relevant work.  Smith considered a hypothetical individual of the claimant's age, education, and vocational background capable of performing at the light exertional level with occasional stooping, kneeling, crouching, crawling and balancing; with a moderate limitation in concentration, persistence, and pace defined as the ability to understand, remember, and carry out simple one-two-three step tasks not involving independent judgment over an eight hour day with appropriate breaks; with a

moderate limitation on the ability to engage in social interactions, requiring an object oriented task with only occasional work-related interactions with supervisors, coworkers, and the public; and with a moderate limitation on the ability to respond appropriately to customary work pressures. He testified that such an individual would be able to perform the requirements of the following jobs (available in the following numbers (1) in Rhode Island and Southeastern Massachusetts and (2) nationally): assembly, light exertion (4,7000 and 400,000); hand packager, light exertion (2,000 and 170,000); inspector, light exertion (1,400 and 100,000); assembly, sedentary (900-1,000 and 87,000); general production laborer, sedentary (700-800 and 54,000); and inspector, sedentary (200-300 and 13,000). He testified that if she had the ability to only occasionally grasp with the left non-dominant hand, she would not be capable of the sedentary

inspector positions, but she could work as a foot press perator[4]

or in an inspector position requiring light exertion.

###     3.   Decision of the ALJ

The ALJ engaged in the standard five step evaluation process

established by the Social Security Administration under the

authority of the Social Security Act.  *See* 20 C.F.R.

§§ 404.1520(a), 416.920(a).[5]

---

[4]  The vocational expert's testimony on this topic was
somewhat confusing.  When asked if some jobs would be precluded
if the claimant could only occasionally grasp with her left hand,
the vocational expert responded: "Occasional grasp, yeah.  You
may be able to do some inspection work.  It wouldn't allow for
like a foot press operator or something along those lines.  The
dominant arm can do that, and that's about 1,000 or so in
southeastern Mass."  While the phrase "[i]t wouldn't allow for"
indicates that the claimant could not be a foot press operator
without the capability to more than occasionally grasp, the
elucidation that "[t]he dominant arm can do that" and the
provision of the number of jobs reasonably clarify that the
vocational expert believed that foot press operator was an
available job to the claimant given a residual functional
capacity including left hand limitations.

[5]  The First Circuit has summarized the five steps: "1) if
the applicant is engaged in substantial gainful work activity,
the application is denied; 2) if the applicant does not have, or
has not had within the relevant time period, a severe impairment
or combination of impairments, the application is denied; 3) if
the impairment meets the conditions for one of the "listed"
impairments in the Social Security regulations, then the
application is granted; 4) if the applicant's "residual
functional capacity" is such that he or she can still perform
past relevant work, then the application is denied; 5) if the
applicant, given his or her residual functional capacity,
education, work experience, and age, is unable to do any other
work, the application is granted."  *Seavey v. Barnhart*, 276 F.3d
1, 5 (1st Cir. 2006).

First, the ALJ determined that the claimant's work after January 1, 2001, did not rise to the level of substantial gainful activity.

Second, the ALJ determined that Dorego suffered from the following severe impairments: degenerative disc disease of the lumbar spine, status post left thumb surgery, and depression. The ALJ found that the claimant's diagnosis of fibromyalgia was unsupported. Further, the ALJ found that Dorego's complaints of marked pain in her left shoulder do not establish a medically determinable severe impairment given that an MRI did not show a rupture of the rotator cuff, that Dorego was diagnosed with tenosynovitis, and that the record did not establish that the shoulder pain imposed more than minimal impairments on Dorego's ability to work.

Third, the ALJ found that the claimant did not have an impairment or combination of impairments that met or was medically equivalent to the listed impairments in the regulations.

Before proceeding to step four of the evaluation process, the ALJ found that Dorego had "the residual functional capacity to perform less than the full range of light work" as defined by the regulation. Specifically, the ALJ found:

> [S]he can lift and/or carry up to 20 pounds occasionally and 10 pounds frequently, as well as sit for at least 6 hours, and stand or walk for up to 6 hours in an 8 hour workday. The claimant may only occasionally stoop, kneel, crouch, or

crawl.  She must avoid concentrated exposure to hazardous
machinery and heights.  The claimant has a moderate
limitation in concentration, persistence and pace, such that
she can understand, remember and carry out simple 1-2-3 step
tasks not involving independent judgment over an 8 hour day
with appropriate breaks.

The ALJ found that "the claimant's statements concerning the
intensity, persistence and limiting effects of [her] symptoms are
not credible to the extent that they are inconsistent with the
above residual functional capacity assessment," because the
medical evidence, the claimant's treatment history, the
claimant's activities of daily living, and the work in which the
claimant has engaged since 2001 indicate that her symptoms are
not as severe as she alleged.  The ALJ also found that the
comprehensive evaluations submitted by Drs. Almeida and Sousa and
by Maria Ferreira were not supported by and were inconsistent
with the record as a whole and so denied them significant
probative weight.  The ALJ found, by contrast, that the
comprehensive evaluations submitted by Drs. McGan, Marks, Kaplan
were supported by and consistent with the record as a whole and
so entitled to significant probative weight.

In step four, the ALJ concluded that based on this
determination of Dorego's Residual Fuctional Capacity, Dorego
could not perform relevant past work.  Dorego had previously been
employed as a bakery clerk, cook, sewing machine operator, and
bobbin winder.

Finally, in step five the ALJ concluded that "there are jobs that exist in significant numbers in the national economy that the claimant can perform."  The ALJ relied on the testimony of the vocational expert that an individual of Dorego's age, education, work experience, and residual functional capacity could perform assembly, hand packaging and inspector jobs requiring light exertion as well as sedentary assembly, general production laborer, and inspector jobs.  The ALJ therefore concluded that a finding of "not disabled" was appropriate.

## II.  STANDARD OF REVIEW

Under the Social Security Act, this court has the "power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).  Review is "limited to determining whether the ALJ used the proper standards and found facts based on the proper quantum of evidence."  *Ward v. Comm'r of Soc. Sec.*, 211 F.3d 652, 655 (1st Cir. 2000).

Although I review questions of law de novo, *Seavey v. Barnhart*, 276 F.3d 1, 9 (1st Cir. 2006), the Commissioner's factual findings must be treated as conclusive if they are "supported by substantial evidence," 42 U.S.C. § 405(g).  Substantial evidence exists where "a reasonable mind, reviewing the record as a whole, could accept it as adequate to support

[the Commissioner's] conclusion." *Ortiz v. Sec'y of Health and Human Servs.*, 955 F.2d 765, 769 (1st Cir. 1991) (per curiam) (citation omitted). By contrast, I am not bound by factual findings that are "derived by ignoring evidence, misapplying law, or judging matters entrusted to experts." *Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999) (per curiam).

### III. ANALYSIS

Under the Social Security Act, an individual is "disabled" and therefore eligible for SSDI and SSI benefits if the individual cannot "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423 (providing definition for purposes of SSDI); 42 U.S.C. § 1382(c)(a)(3)(A) (providing definition for purposes of SSI). Dorego argues that the ALJ erred in failing to find her disabled because the ALJ incorrectly evaluated (A) the medical opinion evidence, (B) the applicant's credibility, and (C) the vocational expert testimony.

#### A. *Evaluation of Opinion Evidence*

Dorego contends that the ALJ erred in evaluating the medical opinions in the record. Dorego argues that the ALJ did not properly evaluate the opinions of Maria Ferreira, Dr. Sousa, or Dr. Almeida. Additionally, Dorego argues that the ALJ did not

take into account Dr. Marks's opinion regarding Dorego's difficulties in maintaining concentration, persistence, and pace; Dr. Howland's information regarding Dorego's education; and the evidence on the record regarding Dorego's anxiety.

### 1. Ferreira, Sousa, and Almeida

Social Security regulations state that an ALJ will "always give good reasons . . . for the weight [she] give[s] your treating source's opinion." 20 C.F.R. § 404.1527(d)(2); 20 C.F.R. § 416.927(d)(2). A subsequent Social Security Ruling states that when a decision "is not fully favorable . . . the notice of the . . . decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." SSR 96-2p.

#### i. Maria Ferreira

Dorego contends that the ALJ erred in disregarding the opinion of her treating counselor, Maria Ferreira, LICSW, MSW. In evaluating Ferreira's opinion, the ALJ wrote that "[i]n view of the fact that this evaluation is not supported by and is not consistent with the record as a whole, it is not entitled to significant probative weight." The ALJ did not identify the

inconsistencies or the portions of Ferreira's opinion that were without support.

However, Ferreira is not a "treating source" whose opinion must be expressly evaluated pursuant to the regulations. "Treating source means your own physician, psychologist, or other acceptable medical source," and "[a]cceptable medical source refers to one of the sources described in § 404.1513(a)." 20 C.F.R. § 1404.1502. 20 C.F.R. § 404.1513(a) lists a group of medical professionals that does not include licensed social workers. *See* 20 C.F.R. § 404.1513.

Ferreira instead falls into the category of "other sources" described in subsection (d) of the regulation which states that "[i]n addition to evidence from the acceptable medical sources listed in paragraph (a) of this section, we may also use evidence from other sources to show the severity of your impairment(s) and how it affects your ability to work." 20 C.F.R. § 1404.1513(d). This language is permissive; while the ALJ "may" take Ferreira's opinion into account, she is not obligated to do so. A clinical social worker "cannot be considered a 'medical source' but is instead an 'other source.' Accordingly, the ALJ's use of [her] testimony or the weight [she] assigned thereto was entirely discretionary." *Anderson v. Astrue*, 682 F.Supp.2d 89, 96 (D. Mass. 2010). "Given that 1) the ALJ was not required to consider [the social worker's] opinion and 2) the ALJ found that [the

social worker's] report was inconsistent with the record as a whole, the ALJ's failure to accord it significant weight was reasonable under the circumstances." *Id.*

    ii.  Dr. Sousa and Dr. Almeida

Unlike Maria Ferreira, Drs. Sousa and Almeida are treating sources.  Dr. Almeida is the claimant's primary care provider and Dr. Sousa is her psychiatrist.  Regarding their opinions, the ALJ repetitively employed the same trope: "In view of the fact that this evaluation is not supported by and is not consistent with the record as a whole, it is not entitled to significant probative weight."  Once again, the ALJ failed to identify the inconsistencies or the portions of the doctors' opinions that were without support.

The ALJ's discussion of these opinions is an assertion rejecting without an explanation of the reasons for doing so. The decision is far from providing "specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record . . . ." SSR 96-2p.  The Commissioner's citations of *Goodernote v. Sec'y of HHS*, 690 F.3d 5 (1st Cir. 1982); *Gonzalez Garcia v. Sec'y of HHS*, 835 F.2d 1 (1st Cir. 1987); *Gordils v. Sec'y of HHS*, 921 F.2d 327 (1st Cir. 1990); and *Frustaglia v. Sec'y of HHS*, 829 F.2d 192 (1st Cir. 1987) for the proposition that the ALJ need not specifically discuss a medical opinion or the reasons for rejecting are not

26

compelling.  None of these decisions address compliance with 20 C.F.R. § 404.1527(d)(2), 20 C.F.R. § 416.927(d)(2), or SSR 96-2p for the simple reason that all of these decisions predate the issuance of the regulations in 1991 and the Ruling in 1996.

While I find that the ALJ has erred, "[t]he error may nonetheless be harmless . . . ." *Robinson v. Astrue*, 2010 WL 4365755, at *3 (D. Me. Oct. 27, 2010).  *See also Hodgson v. Barnhart*, 2004 WL 1529264, at *5 (D. Me. June 24, 2004) ("[W]hile the administrative law judge's evaluation of the medical evidence . . . does not comply with 20 C.F.R. §§ 404.1527(d)(2) and 416.927(d)(2) . . . the error is harmless given the conflicting medical evidence on which the administrative law judge was entitled to rely"); *Perez Torres v. Sec'y of HHS*, 890 F.2d 1251, 1255 (1st Cir. 1989) (per curiam) (applying harmless error standard in social security case).  Here, the ALJ  specifically described both Dr. Sousa's and Dr. Almeida's opinions,[6] and from those descriptions the reasons for rejecting them can be gleamed. The ALJ stated that the opinions were not afforded significant weight because they were inconsistent with, and not supported by, the record as a whole.  By and large, substantial evidence exists on the record and in the ALJ's decision to support that judgment.

---

[6] By contrast, in *Lord v. Apfel*, 114 F.Supp.2d 3 (D. N.H. 2000), which the claimant cited in support of reversal, the ALJ's "complete failure to address" the medical opinion raised the possibility that she never considered the opinion at all.  *Lord v. Apfel*, 114 F.Supp.2d 3, 15 (D.N.H. 2000).

Substantial evidence exists on the record to support the
ALJ's decision to afford Dr. Sousa's opinion little weight.  The
ALJ relied on the medical opinion of Dr. Marks, the agency
psychiatrist, who examined the claimant.  Dr. Marks's opinion has
"the assurance of reliability that comes . . . from first-hand
observation and professional examination . . . ."  *Browne v.
Richardson*, 468 F.2d 1003, 1006 (1st Cir. 1972).  The mental
components of the ALJ's residual functional capacity assessment
were in accord with Dr. Marks's opinion.  The ALJ also discussed
the sporadic nature of the claimant's mental health treatment and
the claimant's daily activities, including attending church and
socializing, which the ALJ found undermined the credibility of
the claimant's complaints.  The ALJ had substantial evidence to
afford Dr. Sousa's opinion little weight.  Thus, the ALJ's
failure to provide sufficient evaluation of Dr. Sousa's opinion
was harmless.

Substantial evidence also exists on the record to support
the ALJ's decision to afford Dr. Almeida's opinion little weight.
The ALJ relied on the medical opinions of Dr. McGan, who was a
non-examining, non-testifying, physician, and Dr. Kaplan, who
testified and beforehand was able to assess Dorego's entire
record, including Dr. Almeida's opinion.[7]  The ALJ cited various

---

[7]  Dorego notes that Dr. Kaplan acknowledged that the
claimant's complaints about her pain were consistent.  Dorego
therefore characterizes Dr. Kaplan as agreeing with the

notations in Dorego's medical records indicating that her DDD was mild, that she had normal power in the lower extremities, largely intact sensation, and a symmetric gait. The ALJ noted that Dorego had no surgery for her back, received no injections, and failed to follow through on referrals to a chiropractor and (after the initial evaluation) to a physical therapist. The ALJ also noted that Dorego does light shopping, handles her own personal care, does light house cleaning, and shops with her daughters.

I do find, however, that the ALJ did not have substantial evidence to support her judgment in assigning Dr. Almeida's and Dr. Kaplan's opinions little probative weight regarding one issue. The ALJ did not include any limitations in grasping, or other activities with the left hand, within her residual functional capacity assessment of Dorego. This conflicts not only with Dr. Almeida's assessment but also with Dr. Kaplan's. No other medical opinions were given after the date of the surgery. While Dr. Fox did state that the claimant had "no major complaints in a functional capacity," Dr. Feoktistov noted that Dorego's "[l]eft first metacarpophalangeal joint is unstable and

_____

claimant's treating physicians. However, Dr. Kaplan's overall characterization of Dorego's condition was not in accord with her treating physicians' findings. Crucially, he found that she was capable of work requiring light exertion and that the limitations described by the non-examining agency physician (which were milder than those described by Dorego's treating physicians) were reasonable.

the patient cannot tolerate resisted flexion of the interphalangeal joint."

This is not a situation in which "the only medical findings in the record suggested that a claimant exhibited little in the way of [the] physical impairment[]," *Gordils v. Sec'y of HHS*, 921 F.2d 327 (1st Cir. 1990) (per curiam), but one in which the medical records are mixed in their implications and the only medical experts to opine on the issue (Drs. Kaplan and Almeida) both stated that they believed the claimant suffered a functional deficit. "An ALJ is simply not at liberty to substitute his own impression of an individual's health for uncontroverted medical opinion." *Heggarty v. Sullivan*, 947 F2d 990, 996 (1st Cir. 1991) (per curiam). Here, the ALJ was not at liberty to opine that Dorego had no functional limitations in her left thumb.

This error, too, however, was harmless. The ALJ specifically asked the vocational expert whether Dorego would be able to perform the jobs discussed "[w]ith a non, even occasional grasp." The vocational expert replied that Dorego could be a foot press operator, of which 1,000 or so positions exist in southeastern Massachusetts, and could do light inspection work (although not sedentary inspection work), of which 1,400 positions exist in Rhode Island and southeastern Massachusetts. Two thousand four hundred jobs in the relevant locale is a substantial number. *See Racicot v. Astrue*, 2007 WL 2712488, at

*6 n.4 (D. Mass. Sept. 4, 2007) (citing numerous cases holding lesser numbers of jobs in a region to nonetheless be substantial).  Thus, even though the ALJ erred in her findings regarding Dorego's capabilities, the error was harmless.

    2.   <u>Dr. Marks</u>

     The claimant argues that "Dr. Marks concluded the plaintiff's mental impairment would result in moderate difficulties in maintaining concentration, persistence and pace" and that "[t]his opinion was never properly evaluated pursuant to the regulations . . . which say[] that the state agency medical consultant's opinion must be addressed and weighed by the ALJ." This argument appears to be based on a mis-reading of the record.

    Although the ALJ identified Dr. Marks as "the State agency consultant at the reconsideration level" instead of by name, she did note that Dr. Marks found that the claimant had a moderate limitation in maintaining attention and concentration.  She found that Dr. Marks's opinion was entitled to significant probative weight.  Moreover, the ALJ stated in her assessment of Dorego's residual functional capacity that Dorego "had a moderate limitation in concentration, persistence, and pace," and she included the limitation in the hypothetical that she posed to the vocational expert.

### 3.   Dr. Howland

     The claimant states that Dr. Howland noted in his consultative evaluation that the claimant attended school in Portugal and completed only the eighth grade.  The ALJ found that the claimant "has at least a high school education," but the claimant argues that this was based on a Disability Report made with the claimant's boyfriend acting as a translator that stated that she completed three years of college in 1982 (when she was fourteen years old) and was "[a]n obvious mistake."  Dr. Howland's notes about the claimant's education are not medical opinions, but nonetheless I will address the issue.

     First, the ALJ did not have only one basis for her finding regarding the claimant's educational history.  At the hearing, the claimant testified that she had one year of college.  The claimant's attorney had the opportunity to cross-examine if he believed that the claimant misunderstood the question, and he did not.  Based on the claimant's own testimony at the hearing, the ALJ had substantial evidence for her finding.

     Second, even if the ALJ had erred regarding Dorego's education, any error would have been harmless.  Education is generally one of the vocational factors used to determine an individual's ability to engage in substantial gainful activity. 20 C.F.R. Pt. 404, Subpt. P, App. 2, §  200.00(a).  However, the regulations state that for individuals under age forty five, "the

primary work functions in the bulk of unskilled work relate to
working with things (rather than with data or people) and in
these work functions at the unskilled level, literacy or ability
to communicate in English has the least significance." *Id.* at §§
201.00(h)(2), 202(g).

The vocational expert described all of the jobs discussed as
"object oriented" and stated that "they are not dealing with
customer service or anything like that. They're all dealing with
putting things together and stuff like that." The hypothetical
posed by the ALJ to the vocational expert assumed a "[m]oderate
limitation in . . . concentration, persistence, and pace defined
as the ability to understand, remember, and carry out simple one,
two, and three step tasks not involving independent
judgment . . . ." Given the hypothetical posed, given the simple
object-oriented jobs that the vocational expert named as
available, and given that the claimant raises no particular
reason to believe that education over an eighth grade level would
be necessary for any of the jobs described, I find that any error
regarding the claimant's education was harmless.

4.  Anxiety

Dorego contends that the ALJ classified Dorego's anxiety as
nonsevere although no mental health specialist concurred with the
ALJ. In fact, the ALJ appears to have overlooked the anxiety
diagnosis altogether. The ALJ discussed various complaints,

designating depression, status post left thumb surgery, and DDD as severe and designating fibromyalgia and pain to the left shoulder as non-severe. The ALJ did not mention the anxiety in step two of her analysis at all.

However, the ALJ's failure to discuss the anxiety diagnosis was harmless. The ALJ's decision not to consider the claimant's mental impairments as equivalent to a "listing" was based in substantial evidence, including, *inter alia*, Dr. Marks's medical opinion. The ALJ's assessment of Dorego's residual functional capacity was also based on substantial evidence, including, *inter alia*, Dr. Marks's opinion of Dorego's capabilities (which did assume a diagnosis of anxiety). The claimant raises no reason to believe that the inclusion of anxiety among the claimant's severe impairments would have led to a different residual functional capacity assessment, where the assessment was based on substantial evidence and the symptoms of depression were already included.

## B. *Applicant's Credibility*

The ALJ found that "the claimant's statements concerning the intensity, persistence and limiting effects of [her] symptoms are not credible to the extent they are inconsistent with the [ALJ's] residual functional capacity assessment." Dorego argues that in making this determination, the ALJ failed to valuate her subjective complaints properly in keeping with the requirements

34

of *Avery v. Secretary of Health and Human Services*, 797 F.2d 19,
23 (1st Cir. 1986) (Coffin, J.).  The *Avery* Court held that in
evaluating a claimant's subjective complaints, an ALJ should
consider:

> 1.  The nature, location, onset, duration, frequency,
> radiation, and intensity of any pain;
> 2.  Precipitating and aggravating factors (e.g., movement,
> activity, environmental conditions);
> 3.  Type, dosage, effectiveness, and adverse side-effects of
> any pain medication;
> 4.  Treatment, other than medication, for relief of pain;
> 5.  Functional restrictions; and
> 6.  The claimant's daily activities.

*Avery*, 797 F.2d at 29.  The "*Avery* Factors" are codified at 20
C.F.R. § 416.929(c)(3).

In her decision, the ALJ made "specific findings as to the
relevant evidence [s]he considered in determining to disbelieve
the claimant."  *Da Rosa v. Sec'y of Health & Human Servs.*, 803
F.2d 24, 26 (1st Cir. 1986) (per curiam).  The ALJ recapitulated
the medical opinion evidence.  She credited Dr. McGan's opinion
and Dr. Kaplan's testimony, with the exception of Dr. Kaplan's
view of the left hand restriction.[8]  She credited Dr. Marks's
opinion regarding the claimant's mental limitations.  These
medical opinions support the ALJ's findings regarding the

---

[8]  As discussed *supra* Part III(A)(1)(ii), this exception was
not supported by substantial evidence.

claimant's residual functional capacity[9] and weigh against complaints of further incapacitation.

Further, the ALJ stated that the claimant had no surgery for her back, no injections, and very little physical therapy. She stated that the claimant's her mental health treatment has been only sporadic. She stated that the claimant's activities of daily living, including playing computer games, doing light shopping and house cleaning, handling her own personal care, listening to music, socializing in person and by telephone, and occasionally going to church, contradict her statements regarding the extent of her pain. She stated that the claimant's work activities in 2001, 2003, and 2004 indicate that her symptoms were not as severe as alleged.

The decision thoroughly discussed the medical evidence and treatment history, medical opinions including discussion of functional restrictions and precipitating and aggravating factors, and the claimant's daily activities. The ALJ considered all of this evidence and found Dorego's complaints, beyond those coextensive with the residual functional capacity determination, not to be credible. "The credibility determination by the ALJ, who observed the claimant, evaluated [her] demeanor, and

---

[9] As discussed *supra* Part III(A)(1)(ii), the findings regarding residual functional capacity were not supported regarding the lack of restrictions on the left hand, but the error was harmless.

considered how that testimony fit in with the rest of the
evidence, is entitled to deference, especially when supported by
specific findings." *Frustaglia v. Sec'y of Health and Human
Servs.*, 829 F.2d 192, 195 (1st Cir. 1987) (per curiam).

Dorego's only specifically articulated contention regarding
the ALJ's failure to assess her credibility properly under the
*Avery* Factors is that the ALJ did not address her complaints
resulting from the side effects of medications she takes to
manage her pain and her mental impairments.  At the October 23,
2008, hearing the ALJ did ask the claimant about the side effects
to her medications.  The claimant stated:

> I'm always dizzy.  And my blood pressure is always low.  And
> I feel even to eat I don't have hunger.  My brother's wife
> died two years ago and now I heard that my niece has
> leukemia and this all bothers me a lot . . . .

However, the ALJ did not address the side effects discussed
during the hearing in the written decision.

An ALJ must consider each of the *Avery* Factors, and here the
combination of the ALJ's decision and the questions she asked the
claimant during the administrative hearing demonstrate that she
did so.  While the ALJ's decision did not address medication side
effects, the First Circuit has established no requirement that an
ALJ expressly address each factor in her written decision.  *See
Shields v. Astrue*, 2011 WL 1233105, at *11 (D. Mass. March 30,
2011) ("[T]here is no requirement that [the ALJ] make specific
findings regarding each of the [*Avery*] factors in his written

decision."); *Graham v. Barnhart*, 2006 WL 1236837, at *8 (D. N.H. May 9, 2006) ("an ALJ complies with *Avery* if he explores the factors at the administrative hearing"); *Braley v. Barnhart*, 2005 WL 1353371, at *6 (D. Me. June 7, 2005) (claimant "points to no First Circuit authority for the proposition that an administrative law judge must slavishly discuss each *Avery* factor, and I find none.")

The First Circuit has discussed findings in compliance with *Avery* in a similar case, stating:

> The ALJ thoroughly questioned the claimant regarding his daily activities, functional restrictions, medication, prior work record, and frequency and duration of the pain, in conformity with the guidelines set out in *Avery* regarding the evaluation of subjective symptoms . . . . Although more express findings . . . than those given here are preferable, we have examined the entire record and their adequacy is supported by substantial evidence.

*Frustaglia*, 829 F.2d at 195. Similarly, here, the ALJ questioned the claimant regarding the side effects of her medications in conformity with the guidelines set out in *Avery*. Although express findings regarding the side effects might have been preferable, I am aware of no First Circuit law stating that they are necessary. Furthermore, in view of the entire record, the

ALJ's finding regarding Dorego's credibility[10] is supported by substantial evidence.

## C.    *Vocational Expert Testimony*

Dorego contends that the ALJ failed to ask the vocational expert whether his testimony was consistent with the Dictionary of Occupational Titles (the "DOT"); that the vocational expert did not provide the DOT codes for the jobs he testified the claimant could perform; and that based on the job descriptions in the DOT, the ALJ did not have substantial evidence to support her finding that the claimant is capable of performing a substantial number of jobs in the national economy.

While a vocational expert can provide a basis for an ALJ's findings, "[i]n making disability determinations, [the Social Security Administration] rel[ies] primarily on the DOT . . . for information about the requirements of work in the national economy."  SSR 00-4p.  A Social Security Ruling states:

> Occupational evidence provided by a VE . . . generally should be consistent with the occupational information supplied by the DOT.  When there is an apparent unresolved conflict between VE . . . evidence and the DOT, the adjudicator must elicit a reasonable explanation for the conflict before relying on the VE . . . evidence to support a determination or decision about whether the claimant is

---

[10]  This holding is made with an exception for the ALJ's finding regarding the credibility of Dorego's about the injury to her left hand.  That component of the ALJ's finding is not supported by substantial evidence, as the only medical opinion evidence indicates that Dorego does have difficulty grasping with her left hand.  However, as I held *supra* Part III(A)(1)(ii), this error does not prejudice Dorego.

disabled.  At the hearings level, as part of the
adjudicator's duty to fully develop the record, the
adjudicator will inquire, on the record, as to whether or
not there is such consistency.

*Id.*  The claimant bases her argument on the ALJ's failure to
comply with this ruling.

Here, the ALJ did not ask and the vocational expert did not
state whether his testimony was consistent with the DOT, and
neither the vocational expert nor the ALJ supplied DOT numbers
correlated with the jobs named.  However, failure to inquire
regarding consistency with the DOT is not reversible error if
there is no actual conflict.  *Tetrault v. Atrue*, 2011 WL 613701,
at *7 (D. Mass. Feb. 11, 2011).  Similarly, the omission of DOT
numbers does not provide a per se basis for reversal.  *See*
*Edwards v. Sec'y of HHS*, 34 F.3d 1065 (Table), 1994 WL 481140, at
*2-3 (1st Cir. Sept. 2, 1994) (per curiam).  The Commissioner
argues that any error in clarifying the consistency between the
DOT and the testimony was harmless.  I agree.

After the applicant has shown that she is unable to perform
the work required by past employment, "the Commissioner then has
the burden at Step 5 of coming forward with evidence of specific
jobs in the national economy that the applicant can still
perform."  *Seavey*, 276 F.3d at 5.  The Commissioner may meet that
burden by relying on the testimony of a vocational expert, "[b]ut
in order for a vocational expert's answer to a hypothetical
question to be relevant, the inputs into that hypothetical must

40

correspond to conclusions that are supported by the outputs from the medical authorities." *Arocho v. Sec'y of HHS*, 670 F.2d 374, 375 (1st Cir. 1982).

Here, the hypothetical upon which the ALJ relied was not supported by substantial evidence because the ALJ did not include a limitation on the claimant's ability to grasp and manipulate items with her left hand--a limitation which was found in both medical opinions rendered after Dorego's hand surgery. *See supra* Part III(A)(1)(ii). However, the ALJ did pose another hypothetical including the limitation testified to by Dr. Kaplan, and the vocational expert stated that even with the ability only occasionally to grasp with her left hand, the claimant could perform the job of a foot press operator (where the dominant arm could do the work) or the job of an inspector at the light exertion level. Thus, although the briefing submitted by both parties discusses the other jobs found appropriate by the ALJ, only these two job categories are relevant.

Neither the vocational expert nor the ALJ provides the job code for foot press operator. Neither of the parties does so in it briefing. No DOT entry is labeled "foot press operator." I cannot hold that the failure to inquire as to possible conflicts was harmless when I cannot ascertain the requirements of the job under the DOT. If "there is no corresponding DOT entry for the job[] . . . that in itself is a 'conflict' that demands

explication and resolution." *Eaton v. Barnhart*, 2005 WL 1168460, at *4 (D. Me. March 14, 2005).

Similarly, neither the vocational expert nor the ALJ provides the job code for "inspector." However, here an entry in the DOT is easily located; there is an entry for "inspector, general." The job requires a reasoning level of three, which requires the jobholder to "apply commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form. Deal with problems involving several concrete variables in or from standardized situations." DOT # 609.684-010, *available at* 1991 WL 684911. By contrast, under the hypothetical posed to the vocational expert and under the ALJ's residual functional capacity assessment, "the claimant has a moderate limitation in concentration, persistence and pace, such that she can understand, remember and carry out simple 1-2-3 step tasks not involving independent judgment." The claimant argues that, with her residual functional capacity, she does not have the reasoning level required for the job of inspector.

Neither party law addresses whether the claimant's residual functional capacity conflicts with a reasoning level of three.[11]

---

[11] The Commissioner, addressing various jobs that the ALJ found appropriate for the claimant but that the vocational expert testified would not be appropriate if the claimant had a limitation on grasping with her left hand, argues that the claimant would be capable of jobs requiring a reasoning level of two. The Commissioner does not consider jobs requiring a reasoning level of three.

One case within this circuit has addressed a very similar question, evaluating whether there is a conflict between level three reasoning and a limitation to "basic, four-step" tasks. Magistrate Judge Kravchuk wrote:

> The DOT does not assign a specific number of maximum steps to instructions and operations existing at reasoning levels two and three. The DOT language does describe "a few" variables at level two or "several" variables at level three, but it does not say how many steps the standard routine or the varied routines would entail. In other words, the "basic, four-step" limitation found by the Judge is neither clearly aligned with DOT reasoning levels two or three, nor clearly in conflict with them. An occupation involving a few variables might well entail four-step operations. So might an occupation involving several variables. Consequently, there is no clear conflict between the Judge's residual functional capacity finding and his acceptance of testimony concerning occupations with a reasoning GED level of three. For this reason, Ruling 00-4p does not require remand. In this kind of scenario, the Judge should be permitted to rely on vocational expert testimony that supplies a level three reasoning job in response to a hypothetical requesting jobs involving basic, four-step instructions and tasks.

*Fallon v. S.S.A. Comm'r*, 2011 WL 167039, at *9 (D. Me. Jan. 14, 2011). I find Magistrate Judge Kravchuk's discussion of the lack of apparent conflict between a level three reasoning level and a limitation to basic four-step (or, in this case, simple three-step) tasks persuasive.

Here, unlike in *Fallon*, the ALJ did not ask and the vocational expert did not testify that his responses were consistent with the DOT. However, "an ALJ's failure to ask a vocational expert about a possible conflict between his testimony and the *DOT* is harmless unless there actually was a conflict."

43

*Lafrennie v. Astrue*, 2011 WL 1103278, at *9 (D. Mass. March 23, 2011). The claimant does not point to any particular reason that she could not perform the job of an inspector. She points only to the GED reasoning level, which, as Magistrate Judge Kravchuk wrote, is not sufficient basis to show a conflict.

The vocational expert testified that there were 1,400 positions requiring light exertion for inspectors regionally and that there were 100,000 such positions nationally. This is a substantial number. *See Racicot*, 2007 WL 2712488, at *6 n.4. Because the ALJ relied on the vocational expert's testimony; because at least one section of the vocational expert's testimony addressed the residual functional capacity of the claimant, including the additional limitation that the ALJ should have included; and because part of that section of the vocational expert's testimony did not conflict with the DOT, and still included a substantial number of jobs, the errors alleged by the claimant were harmless.

## IV. CONCLUSION

For the reasons set forth more fully above, I GRANT the Commissioner's motion to affirm (Dkt. No. 14) and DENY the claimant's motion for an order reversing that decision (Dkt. No. 12).

*/s/ Douglas P. Woodlock*
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE